IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 3, 2003 Session

## KAREN CHELTON v. PROVIDENT COMPANIES, INC., ET AL.

**Appeal from the Chancery Court for Hamilton County**
**No. 99-0089     W. Frank Brown, III, Chancellor**

### FILED JUNE 19, 2003

### No. E2002-2282-COA-R3-CV

In this appeal from the Chancery Court for Hamilton County the Plaintiff/Appellant, Karen Chelton, asserts that the Trial Court erred in granting the Defendants/Appellees, Provident Companies, Inc. and Provident Life & Accident Insurance Company (hereinafter "Provident"), summary judgment against her with regard to her cause of action for age discrimination under the Tennessee Human Rights Act. We affirm the judgment of the Trial Court in part, vacate in part and remand for a trial on the merits. Costs of this appeal are adjudged equally against Ms. Chelton and Provident.

**Tenn. R. App. P. 3; Judgment of the Chancery Court Affirmed in Part and Vacated in Part; Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

Boyd Stewart Jenkins, Chattanooga, Tennessee, for the Appellant, Karen Chelton

Christopher Harper Steger, Chattanooga, Tennessee, for the Appellees, Provident Companies, Inc. and Provident Life & Accident Insurance Company

### OPINION

Ms. Chelton was born on August 31, 1941. In 1962 she was hired by Provident as a mail clerk and over the next several years she was employed by Provident in a variety of positions in the areas of accounting, customer service, sales promotion, cashier work, bookkeeping and sales.

In September of 1985 Ms. Chelton was transferred from her position in telemarketing sales to the position of associate underwriter and in 1986 she became an underwriter in Provident's mass marketing department. Job appraisals and memoranda issued in 1988, 1989 and 1990 indicate that Ms. Chelton was exhibiting problems in performing her duties as an underwriter. Ms. Chelton agrees that she was not performing well as an underwriter and in July of 1990 she advised Provident

that she wished to work in marketing. In June of 1991 she began working with Provident's marketing materials and was subsequently given the job title of "marketing support specialist." Ms. Chelton's underwriting duties decreased after 1992 and were eventually phased out altogether.

As of 1995 Ms. Chelton had responsibility for tracking of production, sales materials, promotional campaigns and communications support. However, in July of 1997, some of these duties were removed and Ms. Chelton was given the position of "forms analyst." As forms analyst she was required to, among other things, maintain records and forms and order supplies. In addition to these duties Ms. Chelton was, in October of 1997, assigned to work on a "rebranding" project to change Provident's logo on all company forms in her department. Ms. Chelton testified that, after October of 1997, her duties as forms analyst encompassed about fifty percent of her time and her duties in the rebranding project encompassed the remainder. Also, in October of 1997, Pam Nowlin became Ms. Chelton's immediate supervisor.

Ms. Chelton asserts that, after becoming her supervisor, Ms. Nowlin would not respond to questions from Ms. Chelton about her job and would not speak when the two passed in the hallway. Ms. Chelton attests that Ms. Nowlin would call staff meetings without informing her and then express anger with her for not attending. Ms. Chelton further attests that Ms. Nowlin gave a Christmas luncheon for all of her employees in December of 1997 and did not invite Ms. Chelton. Ms. Chelton maintains that her treatment by Ms. Nowlin was designed to cause her to voluntarily terminate her employment with Provident

In February of 1998 Ms. Chelton was given the job title of "staff support technician". Ms. Chelton testified that, although this job was basically the same as the forms analyst position, the change in job title resulted in a drop in job points under the Company's point system[1] from 404 points to 245 points. Ms. Chelton testified that she was advised by Ms. Nowlin that she would not be eligible for a raise until her points returned to 404. The change in job title also resulted in the re-classification of Ms. Chelton's job status from exempt (salaried) status to non-exempt (hourly) status. Ms. Chelton's salary was not reduced as a result of the change in job title.

In April of 1998, Ms. Chelton met with Ms. Nowlin and Debbie McClanahan, manager of human resources, was advised that there were problems with her job performance and was advised that she was being placed on probation for ninety days. In addition, a procedure was set up pursuant to which she would meet with Ms. Nowlin once a week to discuss performance issues.

On May 12, 1998, Ms. Chelton filed a complaint with the Equal Employment Opportunity Commission alleging that she was being discriminated against because of her age.

On June 17, 1998, Ms. Chelton again met with Ms. Nowlin and Ms. McClanahan. At this meeting Ms. Nowlin advised Ms. Chelton that she had not improved and that she was, therefore,

---

[1] During the time in question Provident implemented the "Hay point system" pursuant to which a particular job was assigned a point value which determined the employee's salary range based upon the job's market value.

being terminated effective June 30, 1998. Ms. McClanahan confirmed in deposition testimony that, although the decision to discharge Ms. Chelton was a team decision, Ms. Nowlin initiated the decision and that, if Ms. Nowlin had determined that Ms. Chelton had "improved performance up to standards, then there would be no termination."

On January 27, 1999, Ms. Chelton filed a complaint in the Chancery Court for Hamilton County stating that she was demoted from her position as an underwriter, that the points upon which her salary and raises were based were reduced from 404 to 245 and that "she was discharged intentionally and solely because of her age." In consequence of these actions, Ms. Chelton charges Provident with violation of the Tennessee Human Rights Act and demands back pay in the amount of $75,000.00, front pay in the amount of $315,000.00 and compensatory damages in the amount of $300,000.00 for humiliation, embarrassment and mental anguish.

Following completion of discovery, Provident filed a motion for summary judgment. On August 19, 2002, the Trial Court entered its memorandum opinion and order granting such motion and Ms. Chelton's complaint was dismissed. This appeal followed.

The sole issue addressed herein, as restated, is whether the Trial Court erred in granting Provident a summary judgment.

In *Staples v. CBL & Associates, Inc.,* 15 S.W.3d 83, 89 (Tenn. 2000) the Tennessee Supreme Court set forth the standard of review appropriate to summary judgments as follows:

> The standards governing the assessment of evidence in the summary judgment context are also well established. Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. *See Robinson v. Omer*, 952 S.W.2d [423]at 426; *Byrd v. Hall,* 847 S.W.2d [208] at 210-211. Courts should grant a summary judgment only when both the facts and the inferences to be drawn from the facts permit a reasonable person to reach only one conclusion. *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn.1995); *Carvell v. Bottoms*, 900 S.W.2d 23,26 Tenn.1995).

Because a trial court's decision to grant a motion for summary judgment is solely a matter of law, it is not entitled to a presumption of correctness. See *Carvell v. Bottoms*, 900 S.W.2d 23 (Tenn.1995). In determining whether such a decision is correct we must review the record to determine if the requirements of Rule 56.04 of the Tennessee Rules of Civil Procedure have been satisfied in that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

As previously noted, Ms. Chelton filed her complaint in this case pursuant to the Tennessee Human Rights Act which appears at T.C.A. 4-21-101, et seq. Tennessee courts have recognized that the purpose and intent of this act is to provide for the execution, in Tennessee, of policies embodied

in federal civil rights laws. Accordingly, the courts of this state have been guided by federal law when analyzing claims under the Tennessee Human Rights Act. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26 (Tenn. 1996) and *Bruce v. Western Auto Supply Co.*, 669 S.W.2d 95 (Tenn. Ct. App. 1984).

The burden shifting analysis applicable in a case such as this one, where there is no direct evidence of discrimination, is as follows. First, a *prima facie* case of age discrimination must be established by proof that the plaintiff (1) was at least forty years of age (2) was subject to adverse employment action (3) was qualified for the position and (4) was replaced by a younger person. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973) and *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994).

Once the plaintiff has proved a *prima facie* case, the burden shifts to the defendant who must submit legitimate, nondiscriminatory reasons for its action. If the defendant meets this burden the plaintiff must prove by a preponderance of evidence that the reasons proffered by the defendant for its actions were merely a pretext for discrimination. The plaintiff must show pretext by proving "either (1) that the proffered reasons had no basis *in fact* (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chemicals Company*, 29 F.3d 1078 (6th Cir. 1994), quoting *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir. 1993), emphasis in *Manzer*.

In the order and memorandum opinion entered by the Trial Court in this case the Court concluded as follows:

> First, the court determined that Ms. Chelton could not establish the <u>prima facie</u> age discrimination claim for the alleged demotion from the underwriter position. Because she had not been performing the underwriting job for many years prior to February of 1998, Ms. Chelton's claim would be time-barred as of the date of she left the underwriting position. Second, the court concluded that Ms. Chelton could not establish the <u>prima facie</u> age discrimination claim for her 1998 termination because a younger employee did not replace her. These two decisions alone warrant the dismissal of Ms. Chelton's claims. However, the court then went on to consider the remaining issues. Even if Ms. Chelton could establish the <u>prima facie</u> age discrimination case, which she has failed to do, the court has determined that Provident has articulated a legitimate, non-discriminatory reason for her termination. Further, Ms. Chelton has not rebutted Provident's legitimate, non-discriminatory reason by establishing that such reason was false, insufficient to support her termination, or unrelated to her discharge.

We must first review the record to determine whether there is any evidence from which a reasonable person could conclude, contrary to the Trial Court's findings, that the elements of a *prima facie* case of age discrimination have been established.

With respect to the elements required to establish a *prima facie* case of age discrimination Provident does not dispute that Ms. Chelton was over forty years of age or that she was qualified for the position from which she was discharged. Rather, Provident contends that Ms. Chelton failed to establish a *prima facie* case of age discrimination because she was not subject to an adverse employment action and because she was not replaced by a younger person. First we address Provident's contention that Ms. Chelton was not subject to an adverse employment action when her job title was changed.

The Trial Court determined that Ms. Chelton "presented insufficient evidence to support her contention that she was the subject of an adverse job action in 1998 when her job title was changed to staff support technician and her job points were reduced from 404 to 245." The Court goes on to state as follows:

> The February 1998 job description and points change simply cannot be described as a demotion from Ms. Chelton's prior title as underwriter because, as she has admitted, she had not been performing as an underwriter for a number of years. She could not be demoted from a position she had not held for years. This alleged demotion was not an adverse employment action and the court will grant the Defendant's motion as to this claim.

The Court concluded that, because Ms. Chelton had not been employed as an underwriter for a number of years, the one year statute of limitations for violations under the THRA barred her action for demotion as an underwriter.

We are compelled to disagree with the Trial Court's reasoning that, because Ms. Chelton had not performed as an underwriter for years, the action taken by Provident in February of 1998 was not an adverse employment action. While the fact that Ms. Chelton was no longer performing the services of an underwriter may have presented Provident with a legitimate reason for changing her job title, this does not answer the question of whether the change in title with its attendant consequences was an adverse employment action. Whether Provident had a legitimate reason for its action is not relevant in determining whether its actions were adverse. Although Ms. Chelton had not been employed as an underwriter for some time, no adverse action was taken by Provident, in consequence of that fact, until February of 1998.

Provident argues that the reduction in job points did not result in tangible detriment to Ms. Chelton and that the harm claimed by Ms. Chelton is speculative harm. Provident asserts that, because the harm claimed by Ms. Chelton is hypothetical, the change in job title with its resulting diminishment in job points does not constitute an adverse employment action. We find it unnecessary to address this argument based upon other conclusions we have reached as set forth hereinafter.

Although Ms. Chelton additionally states that the change in her job title also resulted in a change in her status from that of exempt (salaried) employee to non-exempt (hourly) employee, she presents no evidence to support a finding that this status difference had adverse consequences.

Ms. Chelton cites *Frazier v. Heritage Federal Bank*, 955 S.W.2d 633 (Tenn. Ct. App. 1997) to support her argument that she suffered "materially adverse changes" in the terms and conditions of her employment as a result of Ms. Nowlin's alleged refusal to speak to her, refusal to answer questions, failure to advise her of meetings and failure to invite her to the employee Christmas dinner. We do not agree that the treatment Ms. Chelton alleges she received from Ms. Nowlin is comparable to the treatment received by the plaintiff in *Frazier*. In that case the plaintiff was a senior vice president of a bank when, at the age of fifty three, she was moved from the bank's customer service department to its customer relations department. The next year, when the bank was converted to a publicly held company, the plaintiff was not offered any of the benefits of the stock option plan or listed on the company prospectus and the prospectus indicated that other executive officers were receiving substantially higher salaries than she was. After completing projects, she was not assigned new ones, was excluded from meetings and could not get secretarial support. This Court found that, although the plaintiff's salary had not been reduced, "the constant reduction in her duties and prestige at the bank were 'materially adverse changes' in her terms and conditions of employment sufficient to qualify as discriminatory actions." We do not find the actions Ms. Chelton attributes to Ms. Nowlin to be analogous to the actions of the bank in *Frazier*. We find no evidence of a "constant reduction" in Ms. Chelton's "duties and prestige." In fact, Ms. Chelton states in her brief that her "job duties were essentially the same after Pam Nowlin became her supervisor."

Aside from asserting that she suffered an adverse employment action by reason of her title change in February of 1998, Ms. Chelton also asserts, as noted, that she was subject to an adverse employment action by reason of the termination of her employment on June 30, 1998. It is not disputed that Ms. Chelton's termination was an adverse employment action.

While not disputing that Ms.Chelton's termination was an adverse employment action, Provident contends that Ms. Chelton has still not submitted proof establishing a *prima facie* case of age discrimination by showing that she was replaced by a younger person. Provident maintains, rather, that Ms. Chelton's duties were divided between a number of employees after her termination. Citing *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106 (6th Cir. 2001) and *Brenner v. Textron Aerostructures*, 874 S.W.2d 579 (Tenn. Ct. App. 1993), Provident notes that, under both state and Federal case law, when a former employee's duties are redistributed among remaining employees upon termination this does not constitute replacement. Provident argues that the record shows that, after Ms. Chelton's discharge, her duties with respect to the ordering of company forms and materials was performed on-line, her rebranding duties were assigned to Eugenia Smith and the remaining duties which she had performed were assigned to Paula Shipley, a younger employee, who Ms. Chelton attests was in her twenties or early thirties.

The sole evidence referenced by Provident in support of its assertion that a portion of Ms. Chelton's duties were performed on-line after her termination consists of the following testimony of Ms. Nowlin:

> Q Who took Karen's job when she left?
> A The ordering of the forms and stuff went on-line, *I believe*.
> Q On-line?
> A Computer, you know, *maybe*. ...
> (Emphasis added.)

This Court has noted on prior occasion that "[b]elief, no matter how sincere, is not equivalent to knowledge." *Keystone Ins. Co. v. Griffith*, 659 S.W.2d 364 (Tenn. Ct. App. 1983). Because Ms. Nowlin has qualified her testimony by indicating that it is based upon her belief and further indicated her uncertainty by use of the word "maybe" it is our determination that a jury could reasonably infer that Ms. Nowlin, in fact, did not actually know what happened to Ms. Chelton's duties with regard to the ordering of company forms and materials.

Provident also points out that Ms. Chelton's duties pertaining to the rebranding of company materials were assigned to Eugenia Smith. Ms. Chelton's acknowledges that rebranding accounted for fifty per cent of her job when she was working as staff support technician; however, in the itemization of duties set forth in Provident's description of the position of "staff support technician", the rebranding of materials is not included. Ms. Chelton contends that the rebranding of materials was merely a temporary project assigned to her. This contention is supported by deposition testimony of Ms. Nowlin. As previously noted Ms.Nowlin gave Ms. Chelton responsibility for the rebranding of materials when she took over as her supervisor in October of 1997. When asked if she changed Ms. Chelton's job duties when she became her supervisor, Ms. Nowlin testified as follows:

> Q When you took over supervising Karen Chelton, did you change her job duties at all?
>
> A No. The rebranding of the materials that she worked on and ordered supplies for, all of those items had to be rebranded because of mergers. By rebranding, changing the logos that are on them. So that just fell naturally. That wasn't a new job assignment, *it was something that was short term* that she had to work on because she supplied those forms to the field and to sales support and various people.
>
> Q *But her job duties, what she actually did* –
>
> A Uh-huh.
>
> Q *– remained the same during the time that she worked for you?*

A *Yes*....

(Emphasis added.)

It is our determination that a jury could reasonably conclude from this testimony that the re-branding of materials was merely a temporary project and not part of Ms. Chelton's regular job duties.

Furthermore, we find nothing in that portion of Ms. Nowlin's deposition testimony referenced by Provident which supports its contention that Ms. Chelton's rebranding duties were redistributed to Ms. Smith *upon* Ms. Chelton's termination. On the contrary, Ms. Nowlin's testimony indicates that only part of Ms. Chelton's rebranding responsibilities were assigned to Eugenia Smith and that such assignment occurred in *March* of 1998 and, therefore, *prior* to Ms. Chelton's termination:

>...As we moved through the rebranding process and it wasn't working, what I did was I consolidated one piece of Karen's – Karen didn't view part of the rewriting, looking at the brochures and determining whether they were right, or the pamphlets or whatever, articles of paper that were being reviewed at that point for rebranding, she just routed it. She coordinated routing the documents to the various departments, whether it be the corporate communications law department, to an expert to read within voluntary benefits to review the material to see that the verbiage was right.
>
>Q Uh-huh.
>
>A Karen didn't understand that part of the job. So what we did was we let Eugenia, who was doing EB, that's another part –
>
>...
>
>Q EB standing for employ benefits?
>
>A Yes. And voluntary benefits are just V.
>
>Q Okay. Go ahead.
>
>A *And that was in March. ...*
>
>(Emphasis added.)

When asked who took Ms. Chelton's job when she left Ms. Nowlin testified that Ms. Smith "*continued* to review the documents, because that was working well." (Emphasis added.)

Finally, we note that when Ms. Nowlin was again asked who took Ms. Chelton's job after her discharge she replied, "I would imagine that the pieces that were left, that Paula Shipley took them over and was handling it." It is our determination that a jury could reasonably conclude in the context of Ms. Nowlin's above testimony that the assignment of rebranding duties prior to Ms. Chelton's termination that "the pieces that were left" refers to the portion of Ms. Chelton's job that remained after the distribution of some of her branding duties to Ms. Smith in March of 1998 rather than the portion that remained from a redistribution of her job duties after she was terminated.

In summary, we find sufficient evidence in the record from which a jury could reasonably conclude that Ms. Chelton was replaced by a younger person and Provident's argument that she has failed to create a genuine issue of material fact in this regard is without merit.

Having concluded that there is sufficient evidence in the record to create a genuine issue of material fact with respect to the establishment of a *prima facie* case of age discrimination, we must now review the record to determine if there is sufficient evidence to create a genuine issue of material fact as to whether the reasons proffered by Provident for changing Ms. Chelton's job title and terminating her employment were merely a pretext for discrimination.

Provident asserts that the change in Ms. Chelton's job title which resulted in her loss of job points and re-classification as a non-exempt employee was prompted by the fact that Ms. Chelton was no longer engaged in underwriting duties. Ms. Chelton has the burden of showing that this reason was a pretext by producing evidence that it had no basis in fact, that it did not actually motivate Provident's action or that it was insufficient to motivate Provident's action.

Although Ms. Chelton asserted in her testimony that it was inappropriate for Provident to change her job title, we find no evidence in the record to support this assertion. Ms. McClanahan testified that "[t]he points were reduced to correspond with a more accurate job title that was assigned to her that accurately reflected what she was doing" and that "she had not performed as an underwriter, my understanding, for six years and had been performing the other position." The following testimony of Ms. Chelton confirms that she had carried a higher number of job points prior to the change in her job title because she had, until that time, been mis-classified as an underwriter:

> Q So you didn't ask [Ms. Nowlin] in that conversation why the job was carrying with it less points?
>
> A Less points than what?
>
> Q Than your previous job. You didn't ask her why - - in the conversation, did you ask her why your points were being reduced?

A No. It was because I was being given a new job title and each job title has a certain amount of points to it. And up until that point I had been classified as an underwriter. Even though I wasn't doing the underwriting job, I was still classified as that.

Ms. Chelton's testimony confirms the legitimacy of Provident's proffered reason for changing her job title. The adversity which Ms. Chelton asserts she suffered as a result of the change in job title was the loss of her eligibility for raises because of her reduced job points. Ms. Chelton admits that she was no longer performing work that would have entitled her to continue carrying job points at her previous level and that she had carried the additional points because she was being given credit for duties she was not actually performing. Accordingly, we find that Ms. Chelton has failed to create an issue of fact as to whether Provident's proffered reason for its action had a basis in fact.

Additionally, we do not find that Ms. Chelton has created an issue with respect to whether the reason proffered by Provident for the change in her job title was the actual reason. Under this alternative she would be required to produce circumstantial evidence of age discrimination in addition to that necessary to produce a *prima facie* case and the sheer weight of this evidence would have to make it more likely than not that Provident's ostensible reason for changing her job title was a cover up. *Manzer v. Diamond Shamrock Chemicals Company*, 19 F3d 1078 (6th Cir. 1994) and *F. Ray White v. Regions Financial Corporation*, an unreported opinion of this Court filed in Knoxville on August 7, 2001. We do not find circumstantial evidence of age discrimination in the record which could be reasonably construed as sufficient to satisfy this requirement.

Nor do we find that Ms. Chelton has created an issue as to pretext under the alternative which allows her to show that the reason proffered was insufficient to motivate Provident's change in her job title. Under this alternative Ms. Chelton would be required to show that other employees not in the protected class did not have their job titles changed even though they were similarly situated. As stated by the Court in *Mitchell v. Toledo Hosp.,* 964 F2d 577 (6th Cir. 1992) at page 577:

> Thus, to be "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

See also, *Versa v. Policy Studies, Inc.*, 45 S.W.3d 575 (Tenn. Ct. App. 2000).

Under this standard Ms. Chelton would be required to produce evidence that other employees younger than herself and also under the supervision of Ms. Nowlin were not given a change in job title even though the work they were performing would have merited such a change. We do not find evidence in the record which would satisfy this requirement.

-10-

Based upon the foregoing, we do not find that Ms. Chelton has produced sufficient evidence to avoid summary judgment with respect to her claim that the reason proffered by Provident for changing her job title was a pretext. However, we do find that she has created a genuine issue of material fact as to whether the reason proffered by Provident for her termination was a pretext.

Provident maintains that Ms. Chelton was discharged because of poor job performance and not because of her age. In its brief Provident asserts the following evidence which we construe as being set forth in support of its argument that Ms. Chelton's job performance was deficient:

1) "In October 1997, Ms. Nowlin found it necessary to create a 'branding log' to act as a to-do list for Ms. Chelton, in order to ensure that she completed her job tasks in an efficient and timely manner"

2) On April 16, 1998, Ms. McClanhan met with Ms Chelton to discuss a variety of issues concerning her work and "noted that Ms. Chelton was 'sarcastic and emotional,' particularly in reference to her supervisor (Ms. Nowlin). ... As a result of this meeting, Ms. McClanahan concluded that there were some emotional control issues affecting Ms. Chelton's ability to communicate with other individuals in the workplace."

3) "Ms. Nowlin sent a memorandum to Ms. Chelton on April 20, 1998, noting several continued performance issues, including 'difficulties with following direction and understanding instructions,' which 'resulted in delays and non-productive use of resources within the Company.'"

4) "In October 1988, Ms. Chelton's mid-year performance appraisal noted several ongoing performance issues which continued to be of concern at the time of her subsequent appraisal in 1989. ... In an effort to resolve these problems, on March 28, 1989, Ms. Chelton's supervisor, Dianna Dupree, presented her with a written memorandum addressing these issues.... Ms. Dupree found it necessary to draft a similar memorandum on April 25, 1990, further discussing these concerns. Thus, Ms. Chelton's allegation that her record was spotless until Ms. Nowlin became her supervisor is without basis."

5) "Ms. Nowlin testified in her deposition ... that Ms. Chelton 'wasn't performing her job,' as '[t]he stock was running out, she wasn't following up on the items that she needed to track, and she didn't recall meetings where she was assigned tasks.'... These problems, in turn, resulted in complaints from sales personnel who did not have materials which Ms. Chelton was supposed to keep in stock."

Our assessment of the above statements is as follows.

Statements 1), 3) and 5) constitute assertions made by Ms. Nowlin and their value as evidence that Ms. Chelton was performing poorly is, therefore, dependant upon Ms. Nowlin's credibility. In her affidavit filed in this case Ms. Chelton attests that she asked Ms. Nowlin why she was being placed on probation and was advised by Ms. Nowlin that so many complaints had been

received about her work that she had no choice. Ms. Chelton further attests, "When I pressed her to tell me who had complained about my work, she stated that Darrell Johnson had complained and that he had told her he could no longer work with me." In her deposition, when Ms. Nowlin was asked if she could remember the name of anyone who had complained about Ms. Chelton the only name she could recall was that of Darrell Johnson. However, Mr. Johnson filed an affidavit in this case wherein he states, "I have never complained to any member of management at Provident that Karen Chelton was not doing her job, in fact, she always did an excellent job." We find that Ms. Chelton's undisputed averment that Ms. Nowlin advised her that she was placed on probation because of complaints by Mr. Johnson coupled with Mr. Johnson attestation that he did not complain constitutes sufficient evidence to cause a jury to doubt Ms. Nowlin's credibility. As noted by the U.S. Supreme Court in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097 (2000), "[i]n appropriate circumstances, a trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."

With respect to statement number 2) we do not find the assertion that Ms. Chelton was "emotional and sarcastic" at the described meeting to be probative of poor job performance. Provident states that Ms. McClanahan concluded that "there were some emotional control issues affecting Ms. Chelton's ability to communicate with other individuals in the workplace" The apparent implication of this statement is that Ms. Chelton had emotional problems that affected her job performance. It is our determination from reviewing the relevant portion of Ms. McClanahan's testimony referenced by Provident in support of this statement that a jury could reasonably reach a contrary conclusion:

> Q Did you feel like - - or did you terminate this meeting because of [Ms. Chelton's] inability to exhibit emotional control?
>
> A No.
>
> Q Did you feel like the emotional control issue with her got in the way of – by the time the whole meeting was over that it had gotten in the way of communication between the members of the meeting?
>
> A Certainly.

Ms. McClanhan's notes from the meeting referred to state that "PN and I met today with KC". Although Ms. McClanahan is not asked to identify PN, we assume that PN is Pamela Nowlin. Thus, apparently, the only individuals at the meeting were Ms. McClanahan, Ms. Nowlin and Ms. Chelton. Ms. McClanahan's notes further indicate that Ms. Chelton was advised by Ms. McClanahan of documents showing conversations regarding her performance problems and that Ms. Chelton continuously questioned this documentation. Ms. McClanahan's notes also indicate that Ms. Nowlin's "commun"(communication) was "not good; she was 'coy' - asking questions of KC as tho she (PN) is an attorney rather than commun. directly; PN's body language was forceful and rigid." It could be reasonably inferred from these notes that Ms. Chelton's alleged display of

emotion and sarcasm was her reaction to the manner in which she was being confronted in what she perceived to be an unfair and baseless attack upon her job performance. There is no indication from the referenced testimony that Ms. Chelton's alleged behavior at this meeting negatively impacted the performance of any of her duties as staff support technician or that she exhibited such behavior outside the parameters of this particular meeting. A jury could reasonably conclude that this testimony does not constitute evidence of poor job performance.

As to the statements shown at number 5) the record confirms that Ms. Chelton exhibited some performance problems between 1988 and 1990 which were referenced in the designated performance appraisals and memoranda. However, it is also true that, at the time these documents were issued, Ms. Chelton was still performing the duties of an underwriter. Ms. Chelton acknowledges that she did not perform well in that position, testifying that she did not receive proper training. But she was not performing underwriting services in her position as staff support technician. A jury could reasonably conclude that Ms. Chelton's performance as an underwriter has little or no relevance to her performance of a different job with different duties eight to ten years later.

Ms. Chelton has submitted job appraisal reports from more recent years which evidence favorable evaluations. Appraisal reports issued in 1994 and 1995 show that she met or exceeded objectives in all areas. The 1994 report contains several favorable comments such as "She time and again demonstrated her knowledge of our products and consistently met her deadlines."and "Karen works well with the staff in Corporate Communications, as has proven that she can develop and complete a project in an efficient and timely manner. I look forward to her support in this area." The report issued in 1995 notes, "I look forward to the coming year, and Karen's continued contribution to Voluntary Benefits. We work in an exciting area of the division, and have the opportunity to be very creative in our job. Karen will play a major part in our success!"

Ms. Chelton submits even more recent evidence of Provident's evaluation of her performance in the form of a report dated March 11, 1997. This evaluation report uses a number scale in which numbers one thru five designate categories of performance quality. Under this scale "5" indicates "outstanding"; "4" indicates "exceeds expectations"; "3" indicates "meets expectations"; "2" indicates "below expectations" and "1" indicates "unsatisfactory." Out of a total of twenty six categories, Ms. Chelton was not rated unsatisfactory in any category, was rated "2-3" in two categories and was rated either 3 or 4 in the remaining twenty four categories. In addition to this report, there is the previously noted affidavit of Mr. Johnson, which is dated January 8, 2002, wherein he attests that Ms. Chelton "always did an excellent job."

Based upon our above analysis of the evidence presented in this case we find that there is a genuine issue of material fact as to whether the reason for Ms. Chelton's termination proffered by Provident is a pretext.

Provident questions the authority of *Versa v. Policy Studies, Inc.*, 45 S.W.3d 575 (Tenn. Ct. App. 2000), a case cited by Ms. Chelton in her brief with regard to the matter of pretext. Provident

states that Ms. Chelton, relying on *Versa,* "avers that she can establish pretext by creating an inference that the stated reason for her termination is false.". Provident indicates that this Court cited two cases in *Versa* as support for this proposition - *Kline v. Tennessee Valley Authority*, 128 F.3d 337 (6th Cir. 1997) and *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 11220 (7th Cir.). Provident maintains that these two cases "have been partially disapproved" and "specifically limited" by the U.S. Supreme Court in *Reeves v. Sanderson Plumbing Prod.s, Inc.*, *ibid*.

In *Reeves* the plaintiff alleged that he was discharged because of his age. At trial in district court the plaintiff established a *prima facie* case of age discrimination. His employer then proffered a legitimate reason for his termination and the plaintiff introduced rebuttal evidence to prove that the employer's proffered reason was a pretext. The jury found in favor of the plaintiff. However, the Court of Appeals for the Fifth Circuit reversed finding that, although the plaintiff may have presented sufficient evidence for the jury to find that the employer's proffered reason for its action was a pretext, it did not follow that the plaintiff had presented sufficient evidence to show that he had been fired because of his age. On further appeal, the Supreme Court found that the Circuit Court of Appeals had misconceived the evidentiary burden on the plaintiff by "proceed[ing] from the assumption that a prima facie case of discrimination, combined with sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory reason for its decision, is insufficient as a matter of law to sustain a jury's finding of intentional discrimination."

Provident misconstrues *Reeves*. In *Reeves* the Court' sole reference to *Kline* and *Anderson* is to indicate that these cases stand for the proposition that a "*prima facie* case combined with sufficient evidence to disbelieve [the] employer's explanation *always* creates [a] jury issue of whether [the] employer intentionally discriminated." (emphasis added) The Court does not reference either *Kline* or *Anderson* with respect to the proposition that a plaintiff "can establish pretext by creating an inference that the stated reason for termination is false" We find nothing in *Reeves* to show that it abrogates or disapproves of either case with respect to the latter proposition. In fact, as noted by Provident, the Court in *Reeves* specifically states that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."

Provident also evidently argues that, under *Reeves*, although a trier of fact *may*, in some cases, find that an employer engaged in unlawful discrimination based upon its proffered explanation having been discredited, such a finding is not appropriate in the instant case. Provident argues that Ms. Chelton "has offered no evidence to demonstrate that age played a role in the decision to terminate her employment in June 1998." In support of this argument Provident asserts that Ms. Chelton's contention that she was subject to an adverse job action because of her age is based upon her subjective impression rather than upon objective evidence. Accordingly, Provident argues that Ms. Chelton has failed to meet her ultimate burden of proving that age played a role in Provident's decision to terminate her employment.

The Court in *Reeves* stated as follows at page 2109 with respect to those cases where a *prima facie* case plus sufficient evidence of the falsity of the employer's proffered explanation would not be enough to sustain a jury finding of liability:

> ... Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact finder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. See *Aka v. Washington Hospital Center,* 156 F.3d, at 1291-1292; see also *Fisher v. Vassar College,* 114 F.3d, at 1338 ('[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent'). (Emphasis in original.)

Although, admittedly, these examples are not exhaustive of all the circumstances which would justify summary judgment for an employer despite proof of a *prima facie* case and proof adequate to reject the employer's proffered explanation, they do give an idea of the nature of case in which a motion for summary judgment would survive such proof. We do not find that the case before us is of that nature. We also note the concurring opinion of Justice Ginsburg in *Reeves* at page 2112 in this regard. Justice Ginsburg states that, under the Court's holding that an employment discrimination plaintiff *may* avoid summary judgment by submitting evidence establishing a *prima facie* case and evidence from which a rational trier of fact could find that the employer's proffered explanation for its action was false,

> ...[i]t may be incumbent on the Court, in an appropriate case, to define more precisely the circumstances in which the plaintiffs will be required to submit evidence beyond these two categories in order to survive a motion for judgment as a matter of law. I anticipate that such circumstances will be uncommon. As the Court notes, it is a principle of evidence law that the jury is entitled to treat a party's dishonesty about a material fact as evidence of culpability. *Ante*, at 2108. Under this commonsense principle, evidence suggesting that a defendant accused of illegal discrimination has chosen to give a false explanation for its actions gives rise to a rational inference that the defendant could be masking its actual, illegal motivation. *Ibid.* Whether the defendant was in fact motivated by discrimination

is of course for the finder of fact to decide; that is the lesson of *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).  But the inference remains - unless it is conclusively demonstrated, by evidence the district court is required to credit on motion for judgment as a matter of law, see *ante*, at 2110-2111, that discrimination could not have been the defendant's true motivation.  If such conclusive demonstrations are (as I suspect) atypical, it follows that the ultimate question of liability ordinarily should not be taken from the jury once the plaintiff has introduced the categories of evidence described above.

It is our conclusion that Ms. Chelton has submitted sufficient evidence to establish a *prima facie* case and to discredit Provident's proffered explanation for her termination. Furthermore, we find no evidence which conclusively demonstrates that discrimination could not have been Provident's true intention.

For the foregoing reasons the judgment of the Trial Court dismissing Ms. Chelton's claim for discrimination based upon her demotion and reduction in job points is affirmed; however, the Trial Court's judgment dismissing Ms. Chelton's claim for discrimination based upon her termination is vacated and the case is remanded for a trial of that claim on the merits.  Costs of appeal are adjudged equally against Karen Chelton and Provident.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE

-16-